UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Dawn Y., | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 17 CV 50249 |
|  | ) | Magistrate Judge Iain D. Johnston |
| Andrew Marshall Saul, | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff, who is now 48 years old, is seeking Title II benefits based on chronic body pain she has suffered from, in varying degrees, since at least 2009. No one cause for the pain has been identified with certainty, but the major candidates are degenerative disc disease, obesity, and fibromyalgia. The ALJ found that plaintiff's testimony was not credible because, among other reasons, there were significant treatment gaps. Plaintiff argues that a remand is warranted because the ALJ erred in numerous ways. Although the Court does not find that the ALJ committed any egregious error, or that plaintiff's many criticisms are all justified, the Court nonetheless finds that her collective arguments are enough to justify a remand.

### BACKGROUND

In 2006, plaintiff had back surgery. The back pain returned in 2009, and plaintiff then saw Dr. Sweet, an orthopedist, who ordered an MRI and performed tests and referred plaintiff to Dr. Dahlberg, a pain specialist. R. 28. Plaintiff's primary treatment thereafter was with Dr. Dahlberg. He administered injections, prescribed medication, and recommended a dorsal column stimulator. R. 29. Plaintiff underwent a trial but ultimately chose not to have a permanent

1

stimulator implanted. In February 2016, a couple months before the administrative hearing, plaintiff made a single visit to the office of Dr. Brian Braaksma at OrthoIllinois.

In April 2016, an administrative hearing was held. No medical expert was called. Plaintiff testified that she had lower back pain radiating into her legs, and she stated that there was "no rhyme or reason to what can cause the pain as far as being like too sedentary or too active." R. 60-62. She stated that she had good days and bad days, although more of the latter. When asked what helped with the pain, she stated that there was no "simple answer" and that she had tried ice and heat and took medication, but it had caused side effects. R. 62-63. Plaintiff declined Dr. Dahlberg's offer to implant a permanent stimulator because she found it "unnerving" to "think about something in you permanently that doesn't belong there" and because the trial stimulator did not alleviate pain in six-inch area on her right leg. R. 64, 78.

Plaintiff stated that her fibromyalgia caused "widespread pain" (calves, upper chest, back). She tried Lyrica and Cymbalta for this pain, neither of which worked, and she has tried to exercise "when [she] can." R. 65. She had fibromyalgia flares once every two months, and they would "last anywhere from a few days to a few months." *Id.* Plaintiff stated that no doctor was currently treating her fibromyalgia and that she last saw a specialist years ago and did not take any current medication for this condition because the prior medication (Lyrica) "did not help." R. 76.

When asked about exercising, plaintiff stated that she had tried the exercise bike but could not stay on it for more than five minutes. R. 80. She had not used the bike in over three months. Years ago, she had tried an elliptical machine but it hurt her knees and back.

As for daily activities, she testified that she did activities like vacuuming and sweeping "like once a month" because they "really yank on [her] back." R. 74. She stayed home with three

of her four children (then aged 17, 15, and 7) who were being homeschooled through an online course.[1]

On May 27, 2016, the ALJ issued a 16-page ruling finding plaintiff not credible based on multiple rationales. The ALJ also gave great weight to the opinions of the State Agency physicians. These rationales are considered below.

## DISCUSSION

Before considering plaintiff's numerous criticisms of the ALJ's decision, the Court notes that the Government's brief, in addition to responding to these criticisms, makes the broader argument that the credibility finding must be upheld even if some rationales were flawed. (This is effectively a concession that the ALJ made a few errors.) The Government argues that the Seventh Circuit has adopted a lenient standard, and relies in particular on *McKinzy v. Astrue*, 641 F.3d 884 (7th Cir. 2011) where the court upheld the ALJ's credibility determination even though two out of the three rationales were flawed to some degree. But it is worth noting that the lone remaining rationale in that case—that the claimant's treating physician doubted her allegations—was deemed to be "a smoking gun." *Id.* at 891. Here by contrast, there does not appear to be a single rationale that rises to this level. Rather, plaintiff's argument rests on the accumulated force of many small arguments. This raises a line-drawing question—namely, how many flaws are enough to break the proverbial camel's back.

### I.     Treatment Gaps

The ALJ's main credibility rationale (at least based on the emphasis given to it in the briefs) was the "significant" treatment gaps from 2010 to 2016. These were during the period plaintiff treated with Dr. Dahlberg. The longest gap was "nearly two years" from February 2011

---

[1] Plaintiff has a bachelor's degree in child development. R. 51.

to November 2012. R. 32. Plaintiff acknowledges that these gaps existed, but argues that the ALJ should have explored explanations for them before relying on the inference that lack of treatment meant lack of serious pain.[2] Plaintiff complains that the ALJ not only failed to ask plaintiff any questions at the hearing about these gaps, but also ignored statements in the record alluding to possible explanations. In her briefs, plaintiff lists, in somewhat kitchen-sink fashion, the following explanations: the injections provided only temporary relief; the injections were painful; on at least one occasion plaintiff had trouble getting to the doctor because of the pain; "it appears that Dr. Dahlberg was prescribing pain medication as Neurontin and Percocet" during the 2011-12 gap;[3] the stimulator was delayed twice because plaintiff "needed to have insurance to allow it and complete a psychological evaluation"; the trial stimulator did not work on a six-inch region; and Dr. Dahlberg prescribed a Medrol Dosepak the month before the trial stimulator was implanted.

The Government concedes that the ALJ failed to question plaintiff at the hearing, but argues that this failure was justified because "neither plaintiff nor the record provided possible reasons" for the gaps. Dkt. #16 at 2. Here, the Government seems to be trying to flip the burden of proof by requiring plaintiff to affirmatively offer explanations before the ALJ has any duty of inquiry. Although this might be a reasonable rule to impose (and the Court notes that plaintiff's counsel was taking a risk in not proactively developing this evidence), the Government has not cited to cases holding that plaintiff essentially has an initial burden of production. This point

---

[2] Plaintiff is relying on cases holding that an ALJ has a duty to first ask a claimant about, and then explore, a claimant's explanations for treatment inconsistencies. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.").

[3] In her reply, plaintiff states that the record is not clear "whether or not she was medicated during this time period." Dkt. #17 at 5. It seems that neither side is certain about this question. A claimant's use of medications is an important factor in assessing pain allegations, and should be explicitly addressed on remand.

4

aside, the Government has not adequately responded to plaintiff's claim that there were, in fact, sufficient warning signs or clues in the record to put the ALJ on notice to inquire further.

The Government also argues that plaintiff should explain why, if the injections were painful or ineffective, she did not seek treatment "via other modalities." Dkt. #16 at 3. This is a reasonable question, but it again overlooks the ALJ's independent duty to duty to develop the record. Additionally, there was no medical testimony specifically addressing whether there were any viable alternative treatments available (other than weight loss and exercise, which are addressed separately below). *See, e.g., Hill v. Colvin*, 2015 WL 4561322, *3 (N.D. Ill. July 29, 2015) ("Without any medical testimony or evidence to support his belief, the ALJ seemed to believe that there were other treatments or medications that plaintiff could pursue and was not doing so. [T]he ALJ has failed to identify what these treatments and medications were."). This issue should be explored in more depth on remand.

More broadly, although the ALJ focused heavily on the alleged treatment gaps, the ALJ did not seem to give any weight to the bigger picture—namely, that plaintiff had a number of treatments over a multi-year period that arguably went beyond routine treatment. These included numerous injections and pain medications, as well as the implantation of a trial stimulator.[4]

## II. Whether Plaintiff's Condition Worsened in 2010

The ALJ's second credibility rationale consisted of the following statement:

The record reveals that the claimant's allegedly disabling back impairment was present at approximately the same level of severity prior to the alleged onset date [*i.e.* January 2010]. The fact that the impairment did not prevent the claimant from working at that time suggests that it would not currently prevent work.

---

[4] *See, e.g., Heeman v. Astrue*, 414 Fed. Appx. 864, 868 (7th Cir. 2011) (" what is significant here (as there) is the improbability that Heeman would have undergone all the procedures he did, including the trial insertion of a spinal stimulator, his physical therapy, and his heavy medications, just to create the impression that he was experiencing pain."); *Goble v. Astrue*, 385 Fed. Appx. 588, 591 (7th Cir. 2010) ("We have deemed it improbable that a claimant would undergo pain-treatment procedures such as heavy doses of strong drugs in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking.").

5

R. 32. Although the above explanation does not discuss any of the specific evidence, the Government attempts to fill the gap by arguing that the ALJ observed, in an earlier summary of the medical evidence, that there was "no evidence of compromise of a nerve root until September 2014, more than four years after the alleged onset date." Dkt. #16 at 4. But the claim that plaintiff's condition worsened over time does not rule out the possibility that it was still bad enough in 2010 to meet the disability standard. In her reply, plaintiff cites to evidence that her health had deteriorated around the 2010 onset date. *See* Dkt. #17 at 3. On remand, the ALJ should discuss this issue in more detail if this rationale is to be relied on.

### III. Daily Activities

The ALJ's third credibility rationale was that plaintiff's daily activities were "not limited to the extent one [*i.e.* the ALJ] would expect" given plaintiff's testimony. R. 32. The ALJ set forth several arguments. The first was this statement: "Although the claimant attempted to portray herself as quite limited in her activities of daily living, to the extent that she depends heavily on her children for assistance with household chores and carrying groceries into the house, there is no evidence that the claimant could not do these activities on her own." *Id.* Plaintiff rightly attacks this as an improper attempt to place an undue burden on plaintiff by requiring her to "prove" her own allegations. *See Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("By the ALJ's reasoning, the agency could ignore applicants' claims of severe pain simply because such subjective states are impossible to verify with complete certainty, yet the law is to the contrary."). In short, the ALJ's statement is circular reasoning.

The ALJ next noted that plaintiff had "managed to homeschool her children," which the ALJ surmised was an activity that "can be quite physically and mentally challenging." R. 33. But the problem here is the wiggle words "can be." Plaintiff's testimony was that, *in her particular*

*case*, homeschooling was not demanding because her children took an online course and were relatively self-sufficient. The ALJ may have doubted this testimony but the ALJ provided no evidence to support her one-size-fits-all belief about the rigors of homeschooling.

The ALJ's last two arguments were anecdotal in nature. The AJ noted that the plaintiff mowed her lawn on at least one occasion. But this is a weak rationale. The fact that plaintiff mowed the lawn did not directly contradict any of her testimony; the record was unclear about how frequently plaintiff did this activity; and, most significantly, the ALJ omitted the fact that plaintiff used a riding lawnmower. The ALJ also noted that plaintiff once "jumped off a deck." *Id.* Here again, the factual record is incomplete. Was plaintiff in the habit of jumping off decks? It appears this was a one-time event. At the hearing, plaintiff testified that she merely stepped off a friend's deck (where no handrail had been installed) and that the drop was "not even 2 feet" down. R. 81. In contrast, the ALJ's decontextualized description leaves out these details, thus making it appear that plaintiff was acting carelessly, akin to a bored teenager doing daredevil jumps. Finally, with regard to all these activities, the ALJ did not consider that plaintiff had good and bad days. *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004) ("Carradine does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework.").

### IV.  Failure To Follow Treatment Recommendations

The ALJ faulted plaintiff for not pursuing home exercise and weight loss. Plaintiff complains that the ALJ painted a one-sided picture. She notes that she tried exercising at home, but that it caused pain. Dkt. #11 at 8. She further notes that the ALJ made an error in concluding that "[m]ore aggressive weight-loss methods, such as bariatric surgery, have not been suggested." R. 33. The Government agrees that this was an error. Dkt. #16 at 7 n.1. Regarding

7

the ALJ's criticism that plaintiff did not go to Weight Watchers, plaintiff relies on SSR 02-1p and argues that an ALJ may not rely on the failure to follow a treatment that would not "be successful" in addressing the relevant problems. On this latter point, the record is not clear. It would seem reasonable to suppose that weight loss might help to some extent, but there does not appear to be any medical testimony confirming this point. In sum, the ALJ should develop the record more on remand. It would be helpful to know, for example, what Dr. Dahlberg believed about weight loss and exercise because he was the doctor supervising her pain management.[5]

## V. Dr. Braaksma

The ALJ relied on notes from plaintiff's visit to Dr. Braaksma's office in early 2016 and specifically on the fact that the doctor only recommended that plaintiff do physical therapy at home. The ALJ described this finding as "illustrative," suggesting it was important to the analysis. R. 31. And the Court agrees that this evidence is potentially important because it came from a treating physician. According to the ALJ, Dr. Braaksma found that plaintiff's "clinical and diagnostic imaging findings remained relatively benign," and he "clearly was not impressed by the findings, as evidenced by his statements and recommendation for in-home physical therapy." *Id.* (To be clear, these quotations are the ALJ's *interpretation* of the notes, and are *not* contained in the notes themselves.) Plaintiff argues that the ALJ's interpretations distorted the meaning of the notes.

Plaintiff first argues that these findings were not even made by Dr. Braaksma, but instead by his physician's assistant, Michael McCormick. The Government concedes that plaintiff is

---

[5] At the hearing, plaintiff testified that she was then at her lowest weight in 20 years (down to 265 pounds from 297 in 2010). The ALJ complimented her on this effort—"good for you [] because it's not easy to lose weight." R. 52-54. However, the ALJ did not acknowledge this fact in the written decision.

correct,[6] but argues that this "does not change what the notes impart." Dkt. #16 at 8. This argument is conclusory; the Government does not explain why the relative expertise of the person providing the medical opinion should not be taken into account.

Plaintiff next takes issue with the ALJ's claim that Dr. Braaksma (or, rather, Mr. McCormick) "clearly was not impressed" with the findings and believed they were "relatively benign." Plaintiff argues that the specific findings—that plaintiff "does not have any radicular symptoms that correlate with her MRI findings" and that she did not have "any high-grade nerve impingement that would explain the symptoms"—do not show that Mr. McCormick doubted plaintiff's pain allegations, which is arguably what the ALJ's description suggests. R. 995. The Government argues that ALJ's analysis, whether ultimately correct or not, was a reasonable interpretation of these notes. However, the Court finds that plaintiff has raised enough doubt about this key piece evidence. Given that the findings were (apparently) made by only the physician's assistant, and given that Dr. Braaksma's office was only providing an orthopedic explanation for plaintiff's pain (and not, for example, opining about possible fibromyalgia), this is an issue that would benefit from a deeper analysis.

## VI. Fibromyalgia

Plaintiff complains that the ALJ hastily found that her fibromyalgia was non-severe, failed to follow SSR 12-2p (Evaluation of Fibromyalgia), and did not consider that the State agency doctors "relied on [fibromyalgia] for the RFC" and "specifically mention[ed] it in the credibility assessment." Dkt. #11 at 10. Plaintiff's argument is weakened by the fact that, even though she cites SSR 12-2p, she does not go on to make a case that she meets the specific criteria set forth therein, but merely relies on this regulation for the general notion that an ALJ should

---

[6] The notes were signed by Mr. McCormick and they state that plaintiff "was seen *independently* by Mike McCormick, PA C under the supervision of Dr. Brian Braaksma." R. 996 (emphasis added).

9

"consider credibility with care." *Id.* As for evidence, plaintiff notes that she had been diagnosed with fibromyalgia previously by one doctor and had taken Lyrica to treat this condition but that it did not work. The Government counters that the ALJ properly relied on the fact that plaintiff was not receiving any treatment at the time of the hearing. The Government thus dubs this as another instance where the ALJ was simply weighing conflicting evidence in the way ALJs are permitted to do. In her reply, plaintiff raises a new angle, arguing that the reason plaintiff was not seeing a rheumatologist at the time of the hearing was "*likely* an insurance coverage issue." Dkt. #17 at 6 (emphasis added). The upshot is that the factual record is murky. Based on plaintiff's current arguments, the Court is not persuaded that the ALJ's analysis, even though brief, would justify a remand by itself. Plaintiff's speculation as to the lack of insurance coverage is not helpful. However, on remand, these issues should be addressed more explicitly.

## VII. Failure To Seek An Updated Medical Opinion

Plaintiff argues that a September 2014 MRI showed that her condition had worsened and that the ALJ therefore should have sought an updated medical opinion because the Agency physicians, on whom the ALJ relied, had not seen this new evidence. Plaintiff cites to two Seventh Circuit cases supporting her argument that a remand is required in this situation. *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). Plaintiff argues that 2014 MRI was "new and decisive" evidence. Dkt. #17 at 6.

The Government does not directly address either of the two Seventh Circuit cases relied on by plaintiff, nor does it squarely respond to the underlying contention that the MRI showed plaintiff's condition was worsening. The Government argues instead that the ALJ had discretion to seek an updated opinion. This is true but it sidesteps the relevant question of whether, in this case, the ALJ should have exercised that discretion.

The Government next argues that the ALJ "specifically discussed" the 2014 MRI. Dkt. #16 at 11. This is also true, but the ALJ only did so in the listing analysis and the ALJ did not address plaintiff's point that this evidence arguably rendered the Agency opinions out of date. The Government states that, "[g]iven that the ALJ did not call a medical expert, she clearly did not conclude further elucidation as to the imaging was necessary." *Id.* But this is bootstrapping because the ALJ had to "play doctor" to interpret the MRI in making the decision whether to call a medical expert. *See Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (remanding: "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment."). As plaintiff argues, the MRI report contains several statements that *appear* to at least suggest that there was *some* worsening. *See.* R. 879 ("Interval *worsening* degenerative disc disease L2/L3 with *newly demonstrated* right foraminal/extraforaminal disc bulge") (emphasis added). Perhaps the ALJ will be proven correct but this is a determination that requires a medical expert or an updated opinion from the Agency physicians.

To sum up, the decision to remand is a close one. The ALJ's decision does not contain a glaring mistake, but plaintiff has diligently raised enough questions, along with pointing out a few outright mistakes, that cumulatively have crossed the threshold for a remand. To borrow an old football expression, this is remand by three yards and a cloud of dust.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded for further proceedings.

Date: June 28, 2019        By: _____
                               Iain D. Johnston
                               United States Magistrate Judge